IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Michael Washington, | ) | C/A No.: 1:19-1825-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain, United States District Judge, dated June 17, 2020, referring this matter for disposition. [ECF No. 17]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 16].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons

that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On December 2, 2015, Plaintiff protectively filed an application for DIB in which he alleged his disability began on February 24, 2015. Tr. at 177–78. His application was denied initially and upon reconsideration. Tr. at 99–102, 105–08. On March 27, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Nicole S. Forbes-Schmitt. Tr. at 37–65 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 5, 2018, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 10–26. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 27, 2019. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 51 years old at the time of the hearing. Tr. at 42. He completed high school and served in the United States Marine Corps. *Id.* His past relevant work ("PRW") was as an automobile salesman, a finance

manager, a cable wirer, and an assembler supervisor. Tr. at 59. He alleges he has been unable to work since February 24, 2015. Tr. at 177.

　　　　2.　　Medical History[1]

On January 26, 2015, Plaintiff complained of mild depression and fatigue that had begun weeks prior. Tr. at 375. Melanie Valvo, PA-C ("PA Valvo"), assessed fatigue, provided a work excuse, and counseled Plaintiff on diet, exercise, and sleep hygiene. Tr. at 376.

Plaintiff presented to his primary care physician Edward Giove, M.D. ("Dr. Giove"), to follow up on anxiety and lumbosacral radiculitis on February 27, 2015. Tr. at 373. He reported no improvement in anxiety since starting medication. *Id.* He described stable lower back pain, except when lifting and bending and said he had associated numbness in his left leg and right arm.

---

[1] The record contains treatment notes from John M. Graham, M.D., dated November 12, 2014, July 22, 2015, September 2 and 28, 2015, and May 12, 2016; a cervical magnetic resonance imaging report and magnetic resonance arthrogram of the shoulder dated June 24, 2015; and results of a functional capacity evaluation conducted on April 20, 2016. *See* Tr. at 404–429. These records are likely those of another individual with Plaintiff's first and last name given differences in dates of birth ("DOB"), ages, and weights between the two individuals. *Compare* Tr. at 411 (reflecting DOB of November 23, 1985), 412 (describing patient as "30 Y old Male, DOB: 11/23/1985; and indicating a weight of 300 pounds), and 424–28 (reflecting a DOB of November 23, 1985), *with* Tr. at 432–33 (reflecting "49 Y old Male," DOB of June 15, 1966, and weight of 201.8 pounds on May 12, 2016). The record also reflects different addresses for the two individuals. *Compare* Tr. at 412, *with* Tr. at 432. Because the evidence suggests these records are those of an individual other than Plaintiff, the undersigned has declined to summarize them. The court cautions that this evidence should be removed from the record and should not form the basis for a decision on remand.

*Id.* He denied feeling down, depressed, or hopeless over the prior month. *Id.* Dr. Giove observed positive straight-leg raise ("SLR") on the left and anxious appearance. Tr. at 374. He assessed uncontrolled anxiety and uncontrolled lumbosacral radiculitis. *Id.* Dr. Giove ordered magnetic resonance imaging ("MRI") and noted Plaintiff required intravenous sedation because he was very claustrophobic. *Id.* He prescribed Paroxetine. *Id.*

On March 12, 2015, Plaintiff underwent an MRI of the lumbar spine that showed congenital multilevel narrowing of the central canal; a small right paramedian protrusion at the T12–L1 level that did not narrow the central canal; degenerative disc disease ("DDD") of the lumbar spine; mild L3–4 acquired spinal stenosis; and mild-to-moderate L4–5 acquired spinal stenosis. Tr. at 312.

Plaintiff reported improved anxiety and denied side effects from medication on March 16, 2015. Tr at 371. He described his low back pain as stable, but exacerbated by increased lifting and bending. *Id.* He endorsed numbness in his left leg and right arm. *Id.* Dr. Giove observed Plaintiff to have positive SLR on the left and to appear anxious. Tr. at 372. He assessed improving anxiety and unchanged lumbosacral radiculitis and prescribed Zetia 10 mg. *Id.*

On March 24, 2015, Plaintiff complained of lower back pain, left greater than right leg pain, and left leg weakness resulting in loss of balance. Tr. at

328. John D. Steichen, M.D. ("Dr. Steichen"), noted no abnormalities on physical exam. Tr. at 328–29. He noted the MRI was incomplete and referred Plaintiff for another MRI and to James Keffer, D.O. ("Dr. Keffer"), for pain management. Tr. at 329.

Plaintiff reported no decrease in severity of lumbosacral radiculitis on March 25, 2015. Tr. at 369. He denied side effects from medications. *Id.* He denied feeling down, depressed, or hopeless over the prior month. *Id.* PA Valvo noted no abnormalities on exam. Tr. at 370.

Plaintiff underwent a second MRI of the lumbar spine on April 9, 2015, that showed DDD at L3–4 and L4–5 and moderate central canal stenosis. Tr. at 331–32. The study was comparable to the prior month's MRI. *Id.*

Plaintiff presented to Dr. Keffer and Joe McTavish, PA for a consultation on April 13, 2015. Tr. at 325. He reported a history of low back pain that began in 2007. *Id.* He described his pain as moderate and characterized by achiness and muscle tightness. *Id.* He stated his pain was worsened by working and driving certain vehicles and reduced by adjusting his body position and using opioid medications he had been taking since 2007. *Id.* He endorsed left lower extremity numbness and pain that extended down his posterior leg to his knee. *Id.* Dr. Keffer observed tenderness to palpation of the bilateral lumbar spine, normal reflexes, normal Babinski's sign, absent ankle clonus, 5/5 motor strength, intact pinprick sensation,

normal tone, and negative SLR. Tr. at 326. He assessed low back pain, lumbar spinal stenosis, lumbar spondylosis, left lumbar radiculitis, and lumbar DDD. *Id.* He continued Plaintiff's medications, authorized him to remain out of work, and referred him to physical therapy ("PT"). Tr. at 326–27.

Plaintiff initiated PT on May 6, 2015. Tr. at 274–77. He complained of constant lower back pain and sharp radicular pain, numbness, and tingling in his bilateral lower extremities that extended all the way down his legs and into his feet and ankles. *Id.* He described his pain as worsened by getting up from a seated position, kneeling, and squatting/stooping. *Id.* He indicated he was able to walk without significant pain for approximately four hours, sit for four hours without aggravating pain, and stand for approximately four hours without aggravating pain. *Id.* Emily Albright, PT, DPT ("PT Albright"), observed Plaintiff to demonstrate poor postural habits, decreased lumbar range of motion ("ROM"), and decreased bilateral lower extremity strength. Tr. at 275. She indicated he would benefit from skilled PT. *Id.* Plaintiff participated in PT sessions on May 6, 12, 13 18, 27, and 29 and June 3, 5, and 10, 2015. Tr. at 272–73, 278–306.

On May 15, 2015, Plaintiff reported good response to PT. Tr. at 322. He endorsed lower back pain, but described it as stable. *Id.* He reported bilateral foot pain that was gradually getting better and easing off. *Id.* Dr. Keffer

noted tenderness to palpation of the bilateral lumbar spine, normal gait and reflexes, 5/5 motor strength, and negative SLR. Tr. at 323. He advised Plaintiff to continue PT and medications and restricted him to working no greater than eight hours per day and lifting no more than 25 pounds. Tr. at 324.

Plaintiff reported decreased lower back pain and good response to PT on May 26, 2015. Tr. at 319. He indicated the symptoms in his feet had resolved and he was no longer taking Oxycodone. *Id.* He requested clearance to return to work with restrictions. *Id.* Dr. Keffer observed mild tenderness to palpation of Plaintiff's bilateral lumbar spine, normal gait and reflexes, 5/5 motor strength, and negative SLR. Tr. at 320. He released Plaintiff to return to work with no lifting greater than 25 pounds. Tr. at 321.

On June 10, 2015, PT Albright indicated Plaintiff was independent with his home exercise plan and able to work without pain. Tr. at 305.

On July 7, 2015, Plaintiff reported his lower back pain was mild, intermittent, and largely resolved. Tr. at 316. He complained of some intermittent pain in his left posterior thigh and stated it felt as if he pulled a hamstring. *Id.* He stated he was using more Oxycodone because of the leg pain, but denied side effects. *Id.* Dr. Keffer observed mild tenderness to palpation of the bilateral lumbar spine, normal gait and reflexes, 5/5 motor strength, and negative SLR. *Id.* He prescribed Gabapentin 300 mg at bedtime

and indicated he intended to wean Plaintiff from Oxycodone. Tr. at 317. He stated Plaintiff's work restriction included no lifting greater than 25 pounds. Tr. at 318.

Plaintiff requested a referral to a dermatologist on September 11, 2015. Tr. at 365. He complained of decreased pigmentation on his face, neck, and chest. *Id.* He also endorsed weight gain following a recent increase in his Paroxetine dose. *Id.* He denied feeling down, depressed, or hopeless over the prior two weeks. *Id.* PA Valvo assessed tinea versicolor and weight gain, prescribed Ketoconazole shampoo, referred Plaintiff to a dermatologist, and encouraged him to increase his cardiovascular exercise. Tr. at 365–66.

On September 29, 2015, Plaintiff reported his lower back pain had increased over the prior two weeks. Tr. at 312. He described it as achiness and pressure that was more prevalent on his right side. *Id.* He denied leg pain, paresthesia, and side effects from medication. *Id.* Dr. Keffer observed mild bilateral tenderness to palpation, normal gait, normal reflexes, normal motor strength, and negative SLR. Tr. at 313. Plaintiff indicated a desire to proceed with right lumbar paraspinal trigger-point injections, and Dr. Keffer administered them. Tr. at 314. Dr. Keffer continued Oxycodone-Ibuprofen 5-400 mg, half a tablet twice a day, and Gabapentin 300 mg, one to two capsules at bedtime. *Id.* He indicated Plaintiff should not lift more than 25 pounds. *Id.*

Plaintiff followed up for evaluation of hypertension, hyperlipidemia, and diabetes on November 4, 2015. Tr. at 362. He complained of a bloated, gassy feeling and weight gain. *Id.* He weighed 215 pounds and was 66.5 inches tall. *Id.* He denied feeling down, depressed, or hopeless over the prior two-week period. *Id.* Dr. Giove noted no abnormalities on exam. *Id.* He stopped Lisinopril and prescribed Amlodipine for hypertension, started Metformin HCl ER 500 mg for diabetes, prescribed Phentermine for weight loss, and refilled Paroxetine. Tr. at 363. He ordered lab work. *Id.*

Plaintiff denied feeling down, depressed, or hopeless on December 3, 2015. Tr. at 358. He indicated his weight was improving with diet and medication. *Id.* Plaintiff's glucose, hemoglobin A1c, and cholesterol were high when tested on November 30, 2015. Tr. at 359. Dr. Giove noted no abnormalities on physical exam. Tr. at 360. He increased Metformin HCl ER from 500 to 1000 mg, stopped Zetia, and refilled Crestor and Phentermine. Tr. at 360.

Plaintiff followed up with Dr. Giove to discuss his weight management on January 4, 2016. Tr. at 356. He reported engaging in daily exercise and following a low carbohydrate diet, but indicated he had only lost one pound since his last visit and 10 pounds since starting medications. *Id.* He said he had experienced increased sweating and fatigue since he started Metformin.

*Id.* Dr. Giove noted no abnormalities on exam. *Id.* He refilled Phentermine for weight loss and discontinued Metformin. Tr. at 356–57.

On February 11, 2016, Plaintiff admitted he had felt down, depressed, or hopeless and been bothered by little interest or pleasure in doing things over the prior two weeks. Tr. at 395. He described low back pain and sciatica as well-controlled and stable and denied side effects from medications. *Id.* Dr. Giove noted no abnormal findings on exam. *Id.* He refilled Oxycodone-Ibuprofen 5-400 mg, one tablet, twice a day and started Metformin HCl ER 1000 mg, two tablets. *Id.* Dr. Giove also completed a mental impairment form. Tr. at 391.

On February 16, 2016, state agency consultant Holly Hadley, Psy. D. ("Dr. Hadley"), reviewed the evidence and completed a psychiatric review technique. Tr. at 70–71. She considered Listing 12.06 for anxiety-related disorders and assessed mild difficulties in maintaining social functioning, but no restrictions of activities of daily living ("ADLs"); difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation. *Id.* She concluded Plaintiff's mental impairment was non-severe. *Id.*

On February 17, 2016, state agency medical consultant Stephen Wissman, M.D. ("Dr. Wissman"), assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total

of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally stoop and climb ramps and stairs; frequently crouch and crawl; and avoid concentrated exposure to hazards. Tr. at 72–75.

Plaintiff denied feeling down, depressed, or hopeless over the prior two weeks during a visit with Dr. Giove on May 12, 2016. Tr. at 432. He indicated low back pain and sciatica were well-controlled. *Id.* He denied significant adverse effects from medications. *Id.* Dr. Giove noted no abnormalities on exam. Tr. at 433.

Plaintiff presented to John V. Custer, M.D. ("Dr. Custer"), for a consultative examination on June 13, 2016. Tr. at 442. He stated he felt "out of balance" because of back pain, anger problems, side effects of medication, and weight gain. *Id.* He reported he was suspended and ultimately fired from his job following an argument with a manager. *Id.* He said he had recently been involved in a physical altercation with his wife in which he attempted to choke her. *Id.* He stated he generally slept for four-to-six hours per night. Tr. at 443. He denied nightmares, but said he had difficulty "turning his mind off." *Id.* He reported he did not deal well with people and indicated a conflict with his neighbors had resulted in them calling the police. *Id.* He stated Buspar and Paxil were effective at treating his psychiatric symptoms. *Id.* He endorsed a history of heavy drinking, indicating he would drink four vodka

drinks three or four times a week. *Id.* He reported doing "a lot of reading" and attending Bible study once a week. *Id.* Dr. Custer observed Plaintiff to demonstrate normal grooming and hygiene and no involuntary movements or pain behaviors. Tr. at 444. He noted normal rate and tone of speech; logical, goal-directed thought process; no evidence of loose associations or flight of ideas; fairly calm affect within the normal range; no evidence of psychosis; and no suicidal or homicidal ideation. *Id.* However, Dr. Custer noted that Plaintiff reported some suspiciousness of the government and what he described as "magical thinking." *Id.* On a cognitive exam, Plaintiff was alert and fully oriented; was able to name current and past presidents; recalled three of three objects immediately and on five-minute recall; spelled "world" forward and backwards; followed a three-step command; copied a geometric design; and score 30/30 on the Folstein Mini-Mental State Exam. *Id.* Dr. Custer diagnosed severe alcohol use disorder, alcohol-induced mood disorder, and unspecified personality disorder. *Id.* He stated Plaintiff's functioning would likely improve with abstinence from alcohol. *Id.* He recommended Plaintiff engage in a substance abuse treatment program and have a representative payee if he were assigned benefits. *Id.*

On July 13, 2016, state agency consultant Michael Neboschick, Ph.D. ("Dr. Neboschick"), reviewed the record and considered Listings 12.04 for affective disorders and 12.09 for substance addiction disorders, in addition to

Listing 12.06. Tr. at 88–89. He assessed Plaintiff as having no restriction of ADLs or repeated episodes of decompensation and mild difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. Tr. at 88.

A second state agency medical consultant, Angela Saito, M.D. ("Dr. Saito"), assessed the following physical RFC on July 15, 2016: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally stoop; frequently kneel, crouch, crawl, and climb ramps and stairs; occasionally reach overhead with the right upper extremity; and avoid all exposure to hazards. Tr. at 90–93.

Plaintiff presented to William Hernandez-Alicea, M.D. ("Dr. Hernandez-Alicea"), to establish primary care through the Veterans Administration ("VA") on October 24, 2016. Tr. at 489. He reported a history of diabetes, hypertension, DDD of the lumbar spine, major depressive disorder ("MDD"), anxiety, unusual stress, and dyslipidemia. *Id.* He requested a referral to a VA mental health specialist. *Id.* Dr. Hernandez-Alicea noted no abnormal findings on physical exam. Tr. at 491–92. He noted post-traumatic stress disorder ("PTSD") and depression screens were positive. Tr. at 492. He continued Plaintiff's course of treatment for his chronic

conditions and sent him to the second floor to schedule a mental health assessment. Tr. at 492–93.

On October 26, 2016, Plaintiff presented to Yolan Watts-Lambert, MSW, LCSW ("SW Watts-Lambert"), for a mental health diagnostic assessment. Tr. at 485. He described himself as feeling like a "loner" for most of his life and endorsed mood disturbance over the prior few years that included panic attacks, sweating, headaches, verbal outbursts, irritability, isolation, and insomnia. Tr. at 485–86. SW Watts-Lambert noted the following findings on mental status exam ("MSE"): well-groomed appearance; no abnormal behavior or psychomotor activity; cooperative, attentive, and guarded attitude toward examiner; depressed and variable/labile mood; flat and congruent affect; no hallucinations; linear and goal-directed thought process; no suicidal ideas, hallucinations, or delusions; and good insight and judgment. Tr. at 486–87. Plaintiff reported difficulty engaging with others, including his family members, and admitted his verbal outbursts had caused his family members such discomfort that he was not permitted to be alone with his grandchildren. Tr. at 487. SW Watts-Lambert assisted Plaintiff in obtaining additional visits for medication management and individual therapy. Tr. at 488.

Plaintiff presented to psychiatrist Melanie T. Hatzis, M.D. ("Dr. Hatzis"), for a mental health consultation on November 17, 2016. Tr. at 459.

He endorsed improving back pain. *Id.* He reported he had previously avoided treatment through the VA and sought management of mental symptoms though his primary care physician. *Id.* He indicated he was attempting to wean down his mental health medications and had stopped Buspar two months prior without experiencing increased anxiety. *Id.* He reported six-to-eight hours of broken sleep each night with "terrible" energy. *Id.* He denied trouble with interests, focus, or appetite. *Id.* He reported a general melancholy state and feeling uncomfortable around people since childhood. *Id.* He endorsed mood swings and difficulty controlling his anger. *Id.* He indicated he experienced intrusive thoughts or nightmares if he saw someone in uniform or something related to the military on television, but described this as happening rarely. *Id.* He endorsed exaggerated startle and denied flashbacks and hypervigilance. *Id.* He reported a history of suicide attempt through drug overdose in the 1980s, but denied mania and suicidal thoughts, intent, and plan. *Id.* Dr. Hatzis observed Plaintiff to be well-dressed and groomed; to be cooperative, maintain good eye contact, and behave in a respectful manner; to demonstrate normal speech and language; to initially demonstrate a tense/anxious affect, but to be more at ease toward the end of the appointment; to endorse normal thought content and logical and linear thought processes; to have intact associations, memory, and attention/concentration; to be fully oriented; and to have good insight and

improving judgment. Tr. at 462. She assessed unspecified depressive disorder and insomnia and indicated a need to rule out trauma-related disorder and social anxiety. Tr. at 463. She advised Plaintiff to taper off Paxil by reducing his dose to 5 mg and using Prozac and scheduled him for therapy. *Id.*

Plaintiff initiated psychotherapy with Kimberly J. Ingram, LMSW ("SW Ingram") on November 30, 2016. Tr. at 476. He reported he was scheduled to return to work at Boeing on December 15 and feared he might hurt someone. *Id.* SW Ingram noted Plaintiff "had a difficult time maintaining any type of eye contact" and "continually looked from the right to the left[,] moving his head back and forth frequently throughout the session." Tr. at 477. However, she stated that by the end of the session, he demonstrated decreased head movement and increased eye contact, as he felt more comfortable. *Id.* She described Plaintiff's mood as anxious, but indicated other normal findings on MSE. *Id.*

Following his visit with SW Ingram, Plaintiff requested to start Prozac. Tr. at 484. Dr. Hatzis prescribed Prozac and advised Plaintiff to begin tapering Paxil from 10 mg to 5 mg, two weeks after starting Prozac. *Id.*

On December 15, 2016, Plaintiff was concerned about his mind racing and indicated he would not be returning to work at Boeing. Tr. at 474. He reported a prior diagnosis of bipolar disorder and endorsed manic episodes during which he experienced increased irritability and anger and had

previously attacked others. *Id.* He said his racing thoughts were contributing to his anxiety and were not responsive to medication. *Id.* SW Ingram noted anxious mood, rare eye contact, and pressured speech, but otherwise indicated normal findings on MSE. *Id.*

Plaintiff followed up with Dr. Hatzis on December 21, 2016. Tr. at 469. He reported feeling better on sunny days. *Id.* He endorsed increased anxiety over the prior three weeks, as he participated in testing and interviews for a job at Volvo. *Id.* He stated he had received a job offer, but was not sure whether he would succeed in the work environment. *Id.* He endorsed a history of frustration "when dealing with people who are not on his intellectual level." *Id.* He stated deep breathing exercises had helped with stress and sleep. Tr. at 469–70. He indicated he had stopped Paxil 10 mg one week after starting Prozac. Tr. at 470. He stated he had lost 30 pounds after changing his diet. *Id.* Dr. Hatzis noted no abnormal findings on MSE. Tr. at 471–72. She advised Plaintiff to continue Prozac and individual therapy with SW Ingram. Tr. at 472.

On December 29, 2016, Plaintiff informed SW Ingram that he had accepted a full-time position at Volvo. Tr. at 467. He endorsed decreased negative thoughts and improved mood. *Id.* SW Ingram observed the following on MSE: casually dressed with neat and clean appearance; normal tone and rhythm of speech with coherent and spontaneous articulation; anxious mood;

appropriate affect; no signs of hallucinations, delusions, or other psychoses; rarely maintained eye contact; pressured speech at times; intact associations; logical thinking with negative thought content; denies suicidal and homicidal ideation; no short- or long-term memory deficits; alert and oriented times three; and fair and appropriate insight and judgment. Tr. at 468.

On January 13, 2017, Plaintiff endorsed decreased negative thoughts and improved mood. Tr. at 466. SW Ingram noted the following on MSE: casually dressed with neat appearance; normal tone and rhythm of speech; coherent and spontaneous articulation; anxious mood; appropriate affect; no signs of psychosis; rarely maintained eye contact; pressured speech at times; intact associations; logical thinking; no deficits in short- or long-term memory; alert and oriented; no suicidal or homicidal ideation; and fair and appropriate insight and judgment. Tr. at 466.

On February 8, 2017, x-rays of Plaintiff's bilateral shoulders showed no evidence of current or prior injury or arthritis. Tr. at 652, 653.

On February 9, 2017, Plaintiff underwent a compensation and pension ("C&P") exam based on alleged service-connected disability to his bilateral shoulders. Tr. at 567–81. Charles Ellis, M.D., indicated Plaintiff's impairment restricted him to lifting only 50 pounds and "[l]imited time of working above shoulder height." Tr. at 576–77.

On August 7, 2017, x-rays of Plaintiff's lumbosacral spine showed hypoplastic ribs at T12 and five lumbar vertebrae with L5 being partially sacralized. Tr. 651–52. It indicated well-preserved disc height at all levels with some retrolisthesis of L4 upon L5. *Id.*

Plaintiff reported doing a little better, but appeared anxious on November 24, 2017. Tr. at 686. SW Ingram described generally normal findings on MSE, aside from anxious mood and fair insight. Tr. at 687–88.

On December 11, 2017, Plaintiff met with peer support specialist Todd Harwood ("Mr. Harwood") to discuss returning to school to pursue a new career path. Tr. at 682–83. Mr. Harwood informed Plaintiff that he might have to complete the Scholastic Aptitude Test ("SAT") to be admitted to the school of his choice. Tr. at 683. He also told Plaintiff that he could not be found unemployable by the VA and participate in vocational rehabilitation. *Id.* Plaintiff was taken aback by this information. *Id.* He indicated his goals were to find meaningful employment and attend school. *Id.*

On January 2, 2018, Plaintiff indicated he was struggling over whether to return to school or work. Tr. at 678. SW Ingram indicated Plaintiff was "unable to answer whether he feels he is able to work and hold a position at this time." *Id.* She observed Plaintiff to appear highly anxious and to be "rubbing his legs consistently." *Id.* She noted anxious mood and poor insight, but otherwise normal findings on MSE. Tr. at 679–80.

On January 12, 2018, Plaintiff indicated he had recently been more assertive in dealing with his mother and had stopped forcing his children to visit her. Tr. at 672. He stated his medications and therapy were working and he had improved since 2015. *Id.* He noted he had not recently needed Gabapentin to sleep. *Id.* He continued to endorse high anxiety and depression, but indicated it was not nearly to its prior level. *Id.* He reported exercising, eating healthy, and investing to pay his bills. *Id.* A depression screen was negative. Tr. at 675–76. Dr. Hatzis observed the following on MSE: professionally dressed and well-groomed appearance; cooperative, good eye contact, pleasant, less fidgety, but sits in chair farthest from examiner; brighter, but still anxious affect; denies suicidal or homicidal ideation; denies hallucinations or delusions; linear thought process; intact associations; intact memory; oriented times four; intact attention/concentration; above-average fund of knowledge; improving judgment; and good insight. Tr. at 673–74. She increased Plaintiff dose of Prozac to 40 mg. Tr. at 674.

Plaintiff reported feeling more depressed than usual on February 9, 2018. Tr. at 668. He indicated his wife complained he was sitting at home and doing nothing. *Id.* SW Ingram noted Plaintiff appeared "somewhat anxious" and described his insight as poor, but noted otherwise normal findings on exam. Tr. at 668, 670. Plaintiff described a disagreement with his wife that had resulted in them not talking for two weeks. Tr. at 668–69. He

acknowledged that his passive aggressive remarks and behavior had led to problems in his relationship and his job at Boeing. Tr. at 699. He admitted he would become "upset periodically to get people to 'back off' from him and leave him alone" when he felt overwhelmed. *Id.* SW Ingram encouraged Plaintiff to consider other communication styles, including assertiveness, and indicated they would discuss how it might be helpful at his next visit. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on March 27, 2018, Plaintiff testified he worked in sales and finance for automobile dealerships for approximately 13 years. Tr. at 43. He stated he started working for Boeing as a wiring assembler in 2009 and subsequently moved into management. *Id.* He said he last worked for Boeing on September 28, 2015. Tr. at 44. He indicated he had left Boeing between February and May 2015 and had worked full-time on light duty from May through his last day of work. Tr. at 45.

Plaintiff testified he was unable to work because of chronic back pain. Tr. at 46. He stated he had also been diagnosed with PTSD and MDD. *Id.* He said the VA found he had a 70% impairment rating for PTSD and MDD based on a June 2017 visit with a psychiatrist. Tr. at 46–47. He stated he stopped working for Boeing because of back pain and stress at work. Tr. at 47. He

said he had an episode that resulted in him being placed on leave for a month while Boeing investigated. Tr. at 47, 48. He testified he was subsequently discharged after the investigators determined he was not able to work well with others. Tr. at 48–49. He admitted he received unemployment benefits after he left Boeing. Tr. at 48.

The ALJ asked Plaintiff if he could perform a job that required he lift and carry no more than 20 pounds and did not require high production rates or working around other people. Tr. at 49. Plaintiff stated he might be able to meet the physical requirements, but was unable to meet the emotional requirements of the job. *Id.*

Plaintiff testified he regularly visited a therapist, but had only visited a psychiatrist for a one-time assessment. *Id.* He stated his Prozac had recently been increased to 40 mg for depression. *Id.* He said he was also taking Gabapentin for insomnia. Tr. at 50. He admitted Gabapentin and Prozac were helping his symptoms. *Id.* He indicated he was taking Oxycodone for pain, but had reduced his dose because the VA was trying to help him wean off it. *Id.*

Plaintiff indicated hypertension also affected his ability to work. *Id.* He stated he had left work at Boeing several times because his blood pressure became elevated. *Id.* He said he sometimes developed hypertension-related headaches when his stress and pain levels were high. *Id.* He said he had been

considered pre-diabetic at one time, but was no longer pre-diabetic after making dietary changes. Tr. at 51.

Plaintiff testified he had initially developed depression and anxiety in 1993, when he served in the Gulf War. Tr. at 51–52. He said his mental issues were triggered by "anything dealing with the military," as well as stress. Tr. at 52. He said he sometimes had difficulty concentrating because his medications caused fatigue and sedation. *Id.* He indicated he had "always had social anxiety," but had more recent difficulty managing it. Tr. at 53.

Plaintiff said he had noticed increased left-sided weakness over the prior week. *Id.* He stated he underwent x-rays and was being referred for an MRI. *Id.* He said he received a letter that stated he had similar problems in his neck to those in his back. *Id.* He indicated he had arthritis in his right shoulder and had sustained a labral tear that prevented him from lifting more than 15 pounds. Tr. at 54–55.

Plaintiff estimated he could stand for 30 minutes at a time and up to four hours per day. Tr. at 53–54. He said he tried not to lift more than 10 to 15 pounds and had been informed he could not lift more than 25 pounds. Tr. at 54. He stated he had balance problems that had caused him to fall. Tr. at 55. He initially said he could sit and focus on a task for two hours before he would need a break. Tr. at 57. However, upon further questioning from his attorney, he said he could "not necessarily" sit for two straight hours on one

23

task and "would probably have to take a break after 30 minutes." *Id.* He stated he had been in constant pain since 2005 and had "mostly bad days." Tr. at 58. He said he would likely be absent from work once a week because of pain. *Id.*

Plaintiff testified he mowed his grass, but subsequently stated his son usually helped him and he had more of a supervisory role. Tr. at 55.

> b.    Vocational Expert Testimony

Vocational Expert ("VE") Carroll Crawford reviewed the record and testified at the hearing. Tr. at 59–62. The VE categorized Plaintiff's PRW as an automobile salesman, *Dictionary of Occupational Titles* ("*DOT*") No. 273.353-010, as light with a specific vocational preparation ("SVP") of 6; a finance manager, *DOT* No. 186.167-086, as sedentary with an SVP of eight; a cable wirer, *DOT* No. 729.381-022, as medium with an SVP of 6; and a supervisor of assemblers, *DOT* No. 726.134-010, as light with an SVP of 7. Tr. at 59. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work; should never climb ladders, ropes, or scaffolds; could occasionally stoop; should avoid concentrated exposure to workplace hazards; would be limited to simple, repetitive tasks; could have no interaction with the general public; could only occasionally work in proximity to, but not in coordination with, others; and could meet only low production quotas. Tr. at 59–60. The VE testified that the hypothetical

individual would be unable to perform Plaintiff's PRW. Tr. at 60. The ALJ asked whether there were any other jobs in the economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of 2 as an office helper, *DOT* No. 239.567-010; a mail room clerk, *DOT* No. 209.687-026; and a clerical messenger, *DOT* No. 239.677-010, with 168,000, 119,000, and 77,000 positions available in the national economy, respectively. Tr. at 60–61.

Plaintiff's attorney asked the VE if a limitation to rarely stooping would preclude light work. Tr. at 61–62. The VE testified that his observation of the office jobs he identified would suggest they could be performed with the restriction. Tr. at 62. Plaintiff's attorney asked the VE to consider that the individual would require unscheduled breaks in addition to those normally permitted. Tr. at 63. He asked whether that would preclude the jobs the VE previously identified. *Id.* The VE stated that in his experience, more than two additional breaks lasting a total of 30 minutes or being off task for more than six percent of the workday was unacceptable in a work setting. *Id.* He testified that employers typically would not permit more than three absences per month. *Id.*

### 2.     The ALJ's Findings

In her decision dated July 5, 2018, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.  The claimant has not engaged in substantial gainful activity since February 24, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: lumbar degenerative disc disease, right shoulder labral tear, major depressive disorder, anxiety, and post-traumatic stress disorder [PTSD] (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he can never climb ladders, ropes, or scaffolds; he can occasionally stoop; he must avoid concentrated exposure to work place hazards; he is limited to simple, repetitive tasks with no interaction with the general public; he can have occasional interaction in proximity with others but cannot work in coordination; and he is limited to low production quotas.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on June 15, 1966 and was 48 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 24, 2015, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 15–21.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to properly consider Plaintiff's treating physician's opinions;

2)    the ALJ did not adequately account for Plaintiff's moderate limitation in concentration, persistence, or pace; and

3)    the Appeals Council erred in declining to consider and weigh new and material evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition

27

of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step). 

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331

F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

### B.    Analysis

#### 1.    Dr. Giove's Opinions

Dr. Giove completed a mental impairment form on February 11, 2016. Tr. at 391. He stated Plaintiff's mental diagnosis was anxiety for which he had prescribed Paroxetine. *Id.* He indicated the medication had helped Plaintiff's condition and denied having recommended psychiatric care. *Id.* He described Plaintiff as oriented to time, person, place, and situation; having intact thought process and appropriate thought content; demonstrating normal mood and affect; and showing good attention, concentration, and memory. *Id.* He classified Plaintiff as having good abilities to complete basic ADLs, relate to others, and complete simple, routine and complex tasks. *Id.* He stated Plaintiff could manage his funds. *Id.*

On March 22, 2018, Dr. Giove completed a physical RFC questionnaire. Tr. at 693–97. He indicated the treatment relationship began in 2004 or 2005, their last contact was on March 2, and he had contact with Plaintiff every six months. Tr. at 693. He stated Plaintiff's diagnoses included DDD of the lumbar spine and lumbar spondylosis and his symptoms included

intermittent lower back pain and left foot numbness that occurred three times weekly. *Id.* He noted Plaintiff had pain with flexion and extension of the lumbar spine that was consistent with MRIs that showed spinal stenosis and disc disease at L3–4 and L4–5. *Id.* He indicated Plaintiff's treatment had included epidural steroid injections, physical therapy, and pain medication, as needed, that might cause fatigue and sedation. *Id.* He noted Plaintiff had demonstrated fair response to treatment in the past. *Id.* He stated Plaintiff's impairments had lasted or were expected to last more than twelve months. Tr. at 694. He indicated Plaintiff was not a malingerer. *Id.* He confirmed that emotional factors, including depression and PTSD, affected Plaintiff's physical condition. *Id.* He indicated Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described in the evaluation. *Id.* He stated Plaintiff's pain or other symptoms were frequently severe enough to interfere with attention and concentration necessary to sustain simple, repetitive work tasks. *Id.* He noted Plaintiff was capable of "low stress" work. *Id.* He explained "[p]hysically able but emotionally not likely able as per psychiatry." *Id.* He estimated Plaintiff could sit for two hours at a time, stand for two hours at a time, sit for four hours in an eight-hour workday, and stand/walk for four hours in an eight-hour workday. Tr. at 695. He indicated Plaintiff would likely require one unscheduled break per two-hour period in addition to usual breaks. *Id.* He stated Plaintiff could

frequently lift 20 pounds or less and could never lift 50 pounds. *Id.* He indicated Plaintiff could occasionally twist and climb stairs, rarely stoop/bend and climb ladders, and never crouch. Tr. at 696. He denied that Plaintiff had limitations in doing repetitive reaching, handling, or fingering. *Id.* He noted Plaintiff's limitations were likely to produce good and bad days. *Id.* He estimated Plaintiff would likely be absent from work about four days per month. *Id.* He explained Plaintiff had "[p]oor rapport with supervisors, co-workers due to possible personality disorder, PTSD and depression" and was "unable in the past to maintain employment." *Id.* He stated the limitations had lasted for over five years and were permanent. Tr. at 697.

Plaintiff argues the ALJ erred in accordingly little weight to Dr. Giove's March 2018 opinion. [ECF No. 11 at 29]. He disputes the ALJ's conclusion that there was "no physical basis for unscheduled breaks or absences from work," citing intermittent, burning lower back and left leg pain that occurred approximately three times per week. *Id.* He rejects the ALJ's assertion that, because he was not a mental health provider, Dr. Giove was "not an appropriate expert to offer opinions on any restrictions due to the claimant's alleged personality disorder." *Id.* at 30. He claims this is inconsistent with his prior allocation of great weight to Dr. Giove's earlier assessment of his mental impairment. *Id.* He maintains the ALJ erred in giving Dr. Giove's

statement less weight because he failed to account for the differences between his February 2016 and March 2018 opinions. *Id.* at 31.

The Commissioner argues substantial evidence supports the ALJ's decision to give little weight to Dr. Giove's 2018 opinion. [ECF No. 12 at 11]. He maintains the ALJ allocated little weight to the opinion because Dr. Giove (1) did not treat the conditions on which he based his 2018 opinion; (2) provided no support for his 2018 opinion; and (3) provided contrary opinions in 2016 and 2018. *Id.* He contends Dr. Giove's statement that Plaintiff was "physically able [to work] but emotionally not likely as per psychiatry," refutes Plaintiff's claim that he based his opinion as to absences on evidence of lower back and leg pain. *Id.* at 12. He maintains Dr. Giove's 2016 opinion was supported by contemporaneous examination findings, but his 2018 opinion was not. *Id.* at 12–13.

Plaintiff claims Dr. Giove indicated his opinion as to ability to handle work stress was related to emotional, as opposed to physical impairments, but did not indicate other aspects of his opinion were so related. [ECF No. 13 at 2–3]. He contends the Commissioner has provided an explanation for the ALJ's consideration of Dr. Giove's opinion that does not appear in the ALJ's decision and serves as improper post-hoc rationalization. *Id.* at 3.

The regulations direct ALJs to accord controlling weight to treating physicians' medical opinions that are well supported by medically-acceptable

clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(4).[4] "[T]reating physicians are given 'more weight . . . since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone[.]'" *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).

"[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 174 (4th Cir. 2011) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). However, unless the ALJ issues a fully favorable decision, her decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record" and must be "sufficiently specific to make clear" to the court "the weight [she] gave to the . . opinion and the reason for that weight." SSR 96-2p, 1996 WL 374188, *5 (1996).

---

[4] Because Plaintiff filed his claim prior to March 27, 2017, the undersigned considers the ALJ's evaluation of the medical opinions of record based on the rules codified by 20 C.F.R. § 404.1527 and explained in SSRs 96-2p and 96-5p. *See* 20 C.F.R. § 404.1520c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 apply"); *see also* 82 Fed. Reg. 15,263 (stating the rescissions of SSR 96-2p, 96-5p, and 06-3p were effective for "claims filed on or after March 27, 2017").

A finding that a treating physician's opinion is not entitled to controlling weight does not mean it should be rejected. SSR 96-2p, 1996 WL 374188, at *4. The ALJ must assess every medical opinion of record in view of the factors in 20 C.F.R. § 404.1527(c), which include "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527(c)).

"[A]bsent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion," *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam), the court should not disturb the ALJ's weighing of the medical opinions of record.

The ALJ wrote the following as to Dr. Giove's opinions:

Dr. Giove submitted a medical source statement dated February 2016 in which he indicated that the claimant was fully oriented with intact thought process and appropriate thought content. (Exhibit 5F). Mood and affect were normal. Attention, concentration, and memory were good. Dr. Giove indicated that the claimant had a good ability to complete basic activities of daily living, relate to others, complete simple, routine tasks, and complete complex tasks. The undersigned has accorded significant weight to Dr. Giove's opinions as they are well

supported by the weight of the evidence of record and are consistent with the claimant's presentation upon examination.

In response to a Physical Residual Functional Capacity Questionnaire dated March 2018, Dr. Giove limited the claimant to sedentary to light work. (Exhibit 17F). He added that he would require unscheduled breaks during an 8-hour workday, in addition to the usual 3 breaks. Dr. Giove stated that the claimant would have a poor rapport with coworkers and supervisors due to his personality disorder. The undersigned has accorded little weight to Dr. Giove's opinions as there is no physical basis for unscheduled breaks or absences from work. Additionally, Dr. Giove is not a mental health professional and is not an appropriate expert to offer opinions on any restrictions due to the claimant's alleged personality disorder. Finally, Dr. Giove failed to account for the drastic difference of opinion stated in his prior medical source statement dated February 2016.

Tr. at 19.

The court is constrained to find the ALJ did not address Dr. Giove's opinions in accordance with 20 C.F.R. § 404.1527 and SSRs 96-2p and 96-5p. In a recent unpublished opinion, the Fourth Circuit cited this court's decision in *Tallmage v Comm'r of Soc. Sec. Admin.*, C/A 1:13-2035-TLW, 2015 WL 1298673, at *3 (D.S.C. Mar. 23, 2015), explaining the factors in 20 C.F.R. § 404.1527(c) "do not create a checklist the ALJ must run through when discussing each opinion," but require the ALJ's "'decision . . . be viewed as a whole' to determine whether [s]he gave due consideration to the various factors." *Barbare v. Saul*, No. 19-1503, --- F. App'x --- (4th Cir. 2020). A review of the ALJ's decision yields little evidence to show she adequately

considered Dr. Giove's opinion in light of the relevant factors in 20 C.F.R. § 404.1527 and the SSRs explaining it.

Despite Dr. Giove's representation that he had served as Plaintiff's family doctor since 2004 or 2005, had examined him every six months, and had last seen him on March 2, 2018,[5] the ALJ did not address the treatment relationship. *See generally* Tr. at 17–20. Aside from the statements quoted above as to the ALJ's weighing of Dr. Giove's opinions, she only referenced the relationship one other time in her decision in summarizing a February 2016 visit. *See* Tr. at 18. Because the ALJ cited only one visit with Dr. Giove and did not explicitly refer to him as a treating physician, it is unclear whether she acknowledge the treating relationship. The record shows Plaintiff treated with Dr. Giove on February 27, March 16, November 4, and December 3, 2015 and January 4, February 11, and May 12, 2016. *See* Tr. at 356–63, 371–74, 395, 432–33. Given statutory deference to the treatment relationship, the court cannot overlook the ALJ's error in declining to address it.

Because the ALJ did not address the treatment relationship between Plaintiff and Dr. Giove, she consequently failed to consider whether Dr.

---

[5] The record contains no evidence of a March 2, 2018 visit with Dr. Giove. It reflects Plaintiff's last visit with Dr. Giove as May 12, 2016. *See* Tr. at 432–33. It is unclear whether Dr. Giove saw, but did not examine Plaintiff on March 2, 2018, or whether the record is incomplete as to Dr. Giove's treatment notes.

Giove's treatment record, aside from the February 2016 treatment note, supported the restrictions he assessed in his March 2018 opinion. Her decision does not address whether Dr. Giove's examination findings supported the restrictions he assessed. *See* Tr. at 19. The ALJ might have reasonably concluded that Dr. Giove's cumulative treatment observations did not support the restrictions he assessed for the reasons the Commissioner advances. However, the court cannot accept the Commissioner's rationale to support the ALJ's decision. "[P]rinciples of agency law limit this Court's ability to affirm based on post hoc rationalizations from the Commissioner's lawyers . . . '[R]egardless [of] whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ.'" *Robinson ex rel. M.R. v. Comm'r of Soc. Sec.*, No. 0:07-3521-GRA, 2009 WL 708267, at *12 (D.S.C. 2009) citing *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). Absent the ALJ's reference to Dr. Giove's findings over the course of treatment that are contrary to his opinion, the court finds her weighing of the treating physician's opinion to lack the support of substantial evidence.

       2.    Moderate Limitation in Concentration, Persistence, or Pace

Plaintiff argues the ALJ failed to include his moderate limitation in concentration, persistence, or pace in the hypothetical question she presented

to the VE. [ECF No. 11 at 31]. He maintains the RFC assessment does not adequately address his moderate limitation in concentration, persistence, or pace. *Id.* at 32.

The Commissioner argues the ALJ assessed an RFC that properly accounted for Plaintiff's limitations in concentration, persistence, or pace by limiting him to simple, repetitive tasks with no interaction with the general public, only occasional interaction in proximity to others, no work in coordination with others, and low production quotas. [ECF No. 12 at 13]. He maintains the ALJ adequately explained how the restrictions in the RFC assessment accounted for Plaintiff's mental limitations. *Id.* at 14–15.

The RFC assessment must be based on all the relevant evidence in the case record and should account for all of the claimant's medically-determinable impairments. 20 C.F.R. § 404.1545(a). Accordingly, for the VE's opinion as to the claimant's ability to perform specific jobs to be supported, "it must be based upon a consideration of all other evidence in the record ... and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). ALJs have discretion in framing hypothetical questions, but the limitations included in the hypothetical questions must be supported by the record. *See Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979). A VE's

testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See id.*

In *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015), the court found the ALJ erred in assessing the plaintiff's RFC. *Id.* It stated "we agree with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* However, the court did not reject the notion that a limitation to simple, routine tasks or unskilled work could account for a moderate limitation in concentration, persistence, or pace in the presence of an adequate explanation for the finding. *Id.* It considered remand appropriate "because the ALJ here gave no explanation." *Id.* This court has interpreted the Fourth Circuit's holding in *Mascio* to emphasize that an ALJ must explain how he considered the claimant's limitation in concentration, persistence, or pace in assessing his RFC. *See Sipple v. Colvin*, C/A No. 8:15-1961-MBS-JDA, 2016 WL 4414841, at *9 (D.S.C. Jul. 29, 2016), adopted by 2016 WL 4379555 (D.S.C. Aug. 17, 2016) ("After *Mascio*, further explanation and/or consideration is necessary regarding how Plaintiff's moderate limitation in concentration, persistence, or pace does or does not translate into a limitation in his RFC.").

The ALJ addressed Plaintiff's degree of limitation in concentration, persistence, or pace as follows:

> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. He reported that he has problems concentrating (Exhibit 8E). His medication affects his ability to pay attention. He also reported difficulty following written and spoken instructions. He stated that he does not handle stress or changes in routine very well.

Tr. at 16. She limited Plaintiff to simple, repetitive tasks with no interaction with the general public; occasional interaction in proximity with others; no work in coordination with others; and low production quotas. Tr. at 17.

A review of the ALJ's decision yields no explanation as to how the RFC assessment accommodated Plaintiff's moderate degree of limitation in concentrating, persisting, or maintaining pace. Pursuant to Listing 12.00(E)(3), evaluation of a claimant's ability to maintain concentration, persistence, or pace requires examination of his "abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(3). "[T]he nature of this area of mental functioning" includes: "initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working

a full day without needing more than the allotted number or length of rest periods during the day."[6] *Id.*

Absent from the ALJ's decision is an explanation as to how the restrictions in the RFC assessment accommodate Plaintiff's specific allegations as to impaired ability to concentrate, persist, or maintain pace. In assessing a moderate degree of limitation as to concentrating, persisting, or maintaining pace, the ALJ acknowledged Plaintiff's allegations that he had difficulty concentrating, paying attention, following written and spoken instructions, handling stress, and handling changes in routine. *See* Tr. at 16. However, she declined to explain how the assessed restrictions accommodated Plaintiff's ability to focus attention on his work or stay on task over a sustained period. It might be that the ALJ concluded Plaintiff could focus attention and stay on task over a sustained period to perform simple, repetitive tasks with low production quotas, provided he had no interaction with the general public, only occasional interaction in proximity with others, and no work in coordination with others. However, in the absence of an explanation for such a conclusion, the undersigned is constrained to find the ALJ did not account for all of the claimant's medically-determinable impairments as required pursuant to 20 C.F.R. § 404.1545(a). Consequently,

---

[6] Although these examples "illustrate the nature of the area of mental functioning," the ALJ is not required to address all of the examples in her decision. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(3).

to the extent the ALJ erred in assessing the RFC that formed the basis of her hypothetical question to the VE, she subsequently erred in relying on the VE's testimony to support the availability of jobs Plaintiff could perform.

### 3. Evidence Submitted to Appeals Council

Plaintiff visited Andrew P. Perry, M.D. ("Dr. Perry"), for a C&P exam on June 16, 2017. Tr. at 27–36. Dr. Perry confirmed that Plaintiff had a diagnosis of PTSD that conformed to criteria in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* ("*DSM-5*"). Tr. at 27. He noted Plaintiff's PTSD developed "in response to a series of potentially life-threatening and traumatic events during the First Gulf War." *Id.* He also diagnosed moderate MDD. *Id.* He wrote Plaintiff's "experiences of re-experiencing military traumatic events through nightmares and intrusive memories [were] due to his PTSD." Tr. at 28. He noted Plaintiff had overlapping symptoms of PTSD and depression. *Id.* He indicated Plaintiff had "[o]ccupational and social impairment with reduced reliability and productivity." *Id.* Dr. Perry reviewed evidence that included Plaintiff's VA medical and service folder, as well as two inventories he completed—the Beck Depression Inventory-II ("BDI-II")and the PTSD Checklist-Military Version ("PCL-M"). Tr. at 29. Plaintiff's score on the BDI-II was consistent with severe depression and a current episode of major depression. *Id.* His score on

the PCL-M indicated he had experienced PTSD to a severe degree over the prior month. *Id.*

Dr. Perry noted Plaintiff "live[d] a socially withdrawn life" and had "become more withdrawn since he left his job in 2015." *Id.* In assessing diagnostic criteria for PTSD, Dr. Perry indicated Plaintiff had directly experienced traumatic events and had witnessed in-person, traumatic events as they occurred to others. Tr. at 32. He identified Plaintiff's intrusion symptoms as: recurrent, involuntary, and intrusive distressing memories of the traumatic events; recurrent distressing dreams in which the content and/or affect of the dream are related to the traumatic events; dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic events were recurring; and intense or prolonged psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic events. Tr. at 33. He indicated Plaintiff persistently avoided stimuli associated with the traumatic events, as evidenced by avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic events and avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic events. *Id.* He noted Plaintiff had negative alterations in cognitions

and mood associated with the traumatic events that began or worsened after the traumatic event occurred, as evidenced by: persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame); markedly diminished interest or participation in significant activities; feelings of detachment or estrangement from others; and persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings). *Id.* He indicated Plaintiff experienced marked alterations in arousal and reactivity associated with the traumatic events, as evidenced by: irritable behavior and angry outbursts (with little or no provocation) typically expressed in verbal or physical aggression toward people or objects; hypervigilance; exaggerated startle response; problems with concentration; and sleep disturbances (e.g., difficulty falling or staying asleep or restless sleep). Tr. at 34. He stated Plaintiff had experienced the disturbances for more than one month. *Id.* He noted the disturbance caused clinically significant distress or impairment in social, occupational, or other important areas of functioning. *Id.* He denied that the disturbance was attributable to the physiological effects of a substance (e.g., medication, alcohol) or another medical condition. *Id.* He identified Plaintiff's symptoms as: depressed mood; anxiety; chronic sleep impairment; mild memory loss, such as forgetting names, directions or recent events; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social

relationships; difficulty in adapting to stressful circumstances, including work or work-like settings; inability to establish and maintain effective relationships; and impaired impulse control, such as unprovoked irritability with periods of violence. Tr. at 34–35.

Dr. Perry described Plaintiff as neatly dressed, talkative, and expressive. Tr. at 35. He noted Plaintiff often went off topic and required redirection. *Id.* He indicated Plaintiff was capable of managing his own affairs. *Id.* He stated Plaintiff's PTSD had manifested "in a silent, avoidant, withdrawn, and covert quality" and his MDD had "developed out of the persistent negative effects of his PTSD." *Id.*

Plaintiff argues the Appeals Council erred in declining to remand the case to the ALJ for consideration of Dr. Perry's June 16, 2017 exam report. [ECF No. 11 at 34–36]. The Commissioner claims the Appeals Council properly declined to remand the case for consideration of the additional evidence because it did not provide a basis for changing the ALJ's decision. [ECF No. 12 at 15–17].

The Appeals Council declined to exhibit the additional evidence. *See* Tr. at 2. It explained the evidence "d[id] not show a reasonable probability that it would change the outcome of the decision." *Id.*

The court declines to address whether the Appeals Council erred in refusing to exhibit Dr. Perry's report. Given the court's finding that the case

should be remanded on other grounds, it is appropriate for the ALJ to consider this evidence on remand.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

June 22, 2020                               Shiva V. Hodges
Columbia, South Carolina           United States Magistrate Judge